W. E. ROBERTSON, Max Maltzman, Elliott Maltzman and Irving Roston, d/b/a W. E. Robertson Co., Plaintiffs,

v.

NEW AMSTERDAM CASUALTY COMPANY and Star Construction Corporation, Defendants.

Civ. A. No. 3878.

United States District Court
W. D. Kentucky,
at Louisville.

July 18, 1962.

Lively M. Wilson, Louisville, Ky., Geo. W. Burch, Jr., Los Angeles, Cal., Goldstein, Goldblock & Barell, New York City, for plaintiffs.

Jos. E. Stopher, Louisville, Ky., Emanuel Harris, New York City, for defendants.

SHELBOURNE, District Judge.

This suit was filed in this Court on November 6, 1959, and was tried to the Court without a jury beginning January 9 and ending January 17, 1961. The transcript of the proceedings had at the trial consists of seven volumes, totaling 1,518 pages. Numerous and extensive briefs were filed, and oral argument was heard subsequent to February, 1962.

The action was instituted by a partnership composed of residents of the State

of California engaged in business under the partnership name of W. E. Robertson Company, hereinafter referred to as Robertson. The original defendant in this action was New Amsterdam Casualty Company, a corporation created under the laws of the State of New York and authorized to engage in business in the State of Kentucky, hereinafter referred to as New Amsterdam. Star Construction Corporation, also a New York corporation and hereinafter referred to as Star, was permitted to intervene as a defendant. The amount in controversy in this action exceeds $10,000.00, exclusive of interest and costs, and the Court acquires jurisdiction under Sections 1332 and 1346 of Title 28, United States Code.

Robertson was the prime contractor with the United States for the construction of 2,040 housing units at Fort Knox, Kentucky. The entire project contracted for by Robertson was for the construction of ten separate building corporations known as the Capehart Housing Projects. Each of the corporations was named after a race horse which had won the Kentucky Derby. The four corporations involved in this action were known as Alsab, Bold Venture, Citation, and Determine.

Star was a sub-contractor with Robertson for the performance of carpentry labor on the four above named corporations, each of which embraced approximately two hundred housing units.

In its complaint in this action, Robertson alleged that Star breached its contract by failing and refusing to perform the carpentry work properly, and that much of that work was so poorly performed that Robertson, at its own expense, was compelled to do much of the work attempted by Star in order to bring same up to the requirements of the contract and to make it acceptable by the United States inspectors in charge of the projects.

Robertson alleged that, by reason of the poor workmanship on the part of Star, other sub-contractors were compelled to do work over and above their respective contracts, the expense of which Robertson had to and did bear. It was further alleged that the poor workmanship and insufficient working forces and supervision of Star delayed the progress of the job and hindered its completion, causing additional overpay and expense. The total amount sought to be recovered by Robertson, as summarized in counsel's brief, was $355,061.45. However, Robertson admitted that Star was entitled to a credit in the amount of $54,469.12, leaving a net amount of $300,592.33 claimed to be due Robertson. Plaintiffs sought judgment for this amount against Star and New Amsterdam, surety on its performance bond.

Star denied Robertson's claim in toto and alleged that any poor workmanship in the carpentry on the projects was due to defective material furnished on the job by Robertson. Star claimed that the Army inspectors imposed tolerances which were unreasonable and not in accord with the terms of either the prime contract or Star's sub-contract. In its counter-claim, Star sought to recover from Robertson damages in the amount of $288,195.21, with interest from January 13, 1959. The counter-claim alleged that Robertson's delay in making Star's work available by failing to coordinate the work of other sub-contractors on the project occasioned a loss in overhead expense and operation to Star.

### FINDINGS OF FACT

From the testimony heard, depositions read, and exhibits filed at the trial, the Court makes the following findings of fact:

1. The contract between Robertson and Star bears the date of May 31, 1957, but apparently it was not signed until about August 1, 1957, and Star began work on the project soon thereafter. By an exchange of letters and through contact of the parties, after work began the sub-contract was slightly altered from its original terms, although there was no formal execution of an amended contract.

2. Robertson's claims against Star are as follows:

| | | |
|---|---|---|
| Aggregate Back Charges | | $ 91,050.18 |
| Delay | | 220,321.17 |
| Overhead | $103,500.00 | |
| Interest | 116,821.17 | |
| Wasted Lumber | | 43,690.10 |
| | Total | $355,061.45 |

Included in the above total of $355,061.45 is the amount of $54,469.12 which Robertson admitted is due Star, leaving the net amount of Robertson's claims as $300,592.33.

3. The first item of back charges is for what counsel and the witnesses referred to as "punch out" work, which was explained to be finishing or corrective work necessary to meet the requirements of the Army inspectors on the projects.

Robertson's employees and the Army inspectors testified that the carpentry work performed by Star was very poor. The walls were out of plumb, the fire blocks (braces between studs) did not fit, the headers over the doors were improperly installed, and the rafters were improperly cut. In a number of the buildings it was necessary to cut and fit braces to make the rafters fit the upper plates on the walls and meet the roofing requirements of the specifications.

Much of the corrective work necessary to meet the requirements of the Army inspectors was done by carpenters employed, supervised, and paid by Robertson. The cost of substantially all of the alleged extra work done by Robertson was kept with its payroll accounts and copies were furnished to Star. Invoices and payroll slips evidencing these back charges were filed as plaintiffs' exhibits at the trial. The amount of $24,282.69 seems large, but there is little doubt that it fairly represents the additional work done by Robertson either to correct work done by Star in a faulty and improper manner or which Star refused to do.

At the insistence of Star, Robertson arranged a conference with the Army inspectors and Star's representatives to discuss its complaint as to the tolerance requirements imposed. Robertson prevailed upon the Army inspectors to enlarge the tolerances, particularly as to the walls being in plumb; the tolerance requirements were extended from one-eighth inch to one-fourth inch as to each four feet on the walls and one-half inch on each four feet on the ceilings.

Star contends that the extra work was necessary because the lumber furnished by Robertson was defective. However, Sections 3 and 18 of the sub-contract required Star to satisfy itself concerning the materials furnished and the meaning and intention of the plans and specifications prior to commencing work on the project. Under Sections 24 and 25 of the sub-contract, Star obligated itself to hold the prime contractor harmless from all damages caused by defective workmanship or materials and delays caused thereby. Therefore, such a contention is without merit.

In a letter to Robertson dated August 7, 1957, Star objected to the use of pine lumber as set forth in the contract and sought to have the contract altered so that the sub-contractor would not be held responsible for defects resulting from the materials or for repair, removal, and replacement work occasioned by the action of the materials. Robertson did not agree to such a change in the contract. However, on August 26, 1957, an agreement was reached by which Robertson was to substitute Douglas fir studs for the Southern pine studs called for in the contract after the pine studs then on the job had been used, and Star would continue to assume responsibility for defective carpentry work and the correction and replacement of all materials required by the Army inspectors. As far as the evidence shows, Robertson thereafter furnished the Douglas fir lumber and the parties apparently treated the contract as unchanged with respect to Star's obligation to make corrections and replacements when required by the Army inspectors.

The Court allows Robertson's claim in the amount of $24,282.69 for back charges on the so-called "punch out" work.

4. Section 26 of the contract provided that the sub-contractor should remove all rubbish, debris, and unnecessary materials and, upon failure to do so, the sub-contractor would pay the actual cost of such removal. The evidence shows that the Army inspectors and Robertson's foremen and superintendents had little success in their efforts to have Star perform this clean-up work and periodically Robertson was required to employ men to do this work. Time slips and payroll summaries support Robertson's claim for this item in the amount of $3,336.17, which is allowed.

5. In redoing some of the carpentry work Star damaged electrical wiring installed by B. & B. Electric Company and did not have it repaired. Robertson was required to expend the sum of $184.53 for this repair work and its claim for same is allowed.

6. The painting contractor was required to repaint portions of the buildings following carpentry repairs made by Star. Robertson was required to pay for this extra work made necessary by Star's poor workmanship and incurred expense in the amount of $12,530.89. Its claim for this item of expense is allowed.

7. Under its contract, Star was required to perform the cutting and notching for the heating and ventilating work, but it failed to do this work because Star apparently was of the opinion that the cutting and notching should be done by sheet metal workers. In an exchange of letters with reference to this matter, it was agreed that cutting and notching for plumbing, heating, and ventilating work within the jurisdiction of the respective trades, or which are customarily or usually done by such trades, should not be included within the scope of the other's contract. The National Joint Board of Settlement of Jurisdictional Disputes ruled that the cutting and notching should have been done by Star. However, when this ruling was made most of the cutting and notching had been done by the heating and ventilating sub-contractor, Airways Corporation, and paid for by Robertson. Robertson is entitled to recover the amount of $10,122.18 paid to Airways Corporation for the cutting and notching work.

8. Metal door bucks or frames were used on the projects. The plans contemplated that the layers of dry wall fitted against the studs would extend beyond the edge of the door buck. Many of the door bucks were not properly placed and Robertson paid to Cather-Olsen, the dry wall sub-contractor, the sum of $16,271.-22 for taping around the door bucks where they came in contact with the dry wall. All of this work was made necessary by the improper installation of the door bucks by Star and the amount paid for it is recoverable by Robertson.

9. Star was required to install the wood grounds in the bathrooms as a part of the carpentry work. Due to improper installation of the wood grounds, it was necessary for the plastering sub-contractor, R. E. Schieve, to do this work at a cost to Robertson of $5,370.00 over and above the amount of the sub-contract with Schieve. There was no substantial dispute about this item and Robertson is entitled to recover the amount paid.

10. The Darnell Waterproofing Company was employed and paid $7,066.76 by Robertson to caulk the joints between the wood and the metal window frames. The performance of this work was admittedly a part of Star's contract and Robertson should recover payment for it.

11. Robertson has sought to charge Star $11,885.74 for miscellaneous materials used in constructing its tool shed and improving its building sites and for delivering finished lumber and millwork to the building sites, obligations imposed upon Star by its sub-contract. We think the proof with respect to these items is inconclusive as to at least one-half of this expense. Therefore, the amount of $5,942.87 is allowed on this claim of Robertson.

12. The total sum the Court has allowed Robertson on its claims for back charges against Star is $85,107.31. By deducting the $54,469.12 admittedly due Star from Robertson for work done under its sub-contract, it has been determined that Robertson is entitled to recover $30,638.19 from Star and its surety company, New Amsterdam, on its claims for back charges.

13. Robertson has sought to recover the additional expense incurred by it for delays occasioned by Star's poor workmanship and delay of other phases of the entire contract on each of the four building corporations here involved as follows:

| | |
|---|---|
| Alsab | $ 14,420.00 |
| Bold Venture | 39,000.00 |
| Citation | 40,200.00 |
| Determine | 9,880.00 |
| Total | $103,500.00 |

The Court has rejected this claim as being entirely speculative and not supported by the evidence.

14. Robertson claimed interest which he has sought to recover from Star on each of the four projects as follows:

| | |
|---|---|
| Alsab | $ 16,649.17 |
| Bold Venture | 43,876.00 |
| Citation | 35,754.19 |
| Determine | 20,541.81 |
| Total | $116,821.17 |

Robertson arrived at the above amounts by calculating the interest on funds borrowed by it to finance the projects. A loan was obtained from the Republic National Bank of Dallas for each of the contracts and areas. It was testified that when the buildings in a given area were completed and accepted by the Army inspectors Robertson was paid and it, in turn, liquidated the construction loan on same. Robertson estimated that the delay in building the Alsab project was two months and five days and has sought to recover interest in the sum of $16,649.17 from Star on this account. Similar calculations were made as to the other three corporations, Bold Venture, Citation and Determine.

The Court finds that this claim was based upon the assumption that all of the delays on all of these projects were caused by Star. Such an assumption is improper and the claim is rejected.

15. Robertson's final claim is for $43,690.10 for lumber allegedly wasted by Star. It would be a matter of mere speculation to say that any lumber wasted under these contracts should be chargeable to Star. There was abundant proof that during the winter of 1957–58 there were snows, rains, and freezing temperatures, weather which prevented construction work being done. The bad weather also interfered with construction of the roads leading to the buildings. It would be an unusual strain on the facts in this case to determine that lumber in excess of what Robertson estimated as essentially necessary for the completion of these contracts should be charged to Star. Robertson's claim for this item is rejected.

16. Star's counterclaim first sought recovery from Robertson of $73,-892.44, the balance due Star for work done under its sub-contract. There was little dispute that substantially that amount was due Star, but Robertson refused to pay it because of the above stated claims it was making against Star.

The second intention of the counterclaim was to recover damages for Robertson's alleged failure to have slabs and masonry walls available in "contonuous fashion" to allow Star to complete at least fifteen apartments a day, which Star's superintendent stated was the contemplated rate for completion of the carpentry work in the apartments when the contract was discussed prior to its execution. By reason of Robertson's alleged failure to coordinate the efforts of other sub-contractors and cause the slab and masonry work to be completed on schedule, alleged furnishing of defective materials and poor access to the building sites, and requiring Star to perform its work within tolerances not required by its contract, Star claimed it was compelled to perform its work un-

der conditions not contemplated when the contract was discussed and executed.

One of Star's principal contentions was that Robertson's alleged furnishing of defective material constituted a breach of the contract. Fritz Sander, a superintendent with Star for many years, testified that the warping and twisting of the framing was the result of the use of Southern pine lumber which had been exposed to the hot sun. His statement was supported by the testimony of John Sander, Davis, Eisner, and other employees of Star. Fritz Sander testified that at least forty-five percent of the first Douglas fir lumber furnished was culled out as unuseable, thrown aside by Star, and picked up by Robertson; but, when the second batch of fir lumber was received it was "much better", and there was no complaint thereafter during the progress of the job.

Star contracted to do the work in accordance with the requirements of the contract, knowing the character of lumber to be used and the conditions surrounding its use. Therefore, the contention as to defective materials, as well as the contention that Army inspectors imposed unreasonable requirements, is without merit since Star's contract with Robertson specified the materials and, in effect, obligated Star to do the work in accordance with the requirements of the Army inspectors.

There was a short time during the construction period in which the supply of material for the carpentry work was short, but there was no showing as to the extent of damage, if any, this occasioned Star. Its contentions that the continuity of its work was disrupted by Robertson's failure to coordinate the work of the other sub-contractors, to furnish adequate roads to the building sites, and to furnish power are, in the opinion of the Court, unsupported by the weight of the testimony. These contentions are much the same as Robertson's efforts to show that Star wasted lumber and caused delays which resulted in additional expense to Robertson and its payment of excessive interest.

Assuming that we have correlated the facts and found them in accordance with the weight of the testimony, we believe the result reached herein is fair to both plaintiffs and defendants. Star executed a contract which required that it perform the work in accordance with the plans and specifications and do the corrective work necessary to meet the Army inspection requirements, which Star failed to do.

It is concluded that the plaintiffs are entitled to a judgment in the sum of $30,638.10. Counsel for plaintiffs, upon notice to opposing counsel, will submit a judgment in accordance with these findings and conclusions.